IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 14, 2015 Session

## STATE OF TENNESSEE v. THOMAS LEE CAREY, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2010-A-254     Mark J. Fishburn, Judge**

_____

**No. M2013-02483-CCA-R3-CD - Filed March 10, 2015**

_____

In 1998, Thomas Lee Carey, Jr. ("the Defendant") was indicted in connection with the 1996 death of Michael Dickerson.  The State entered a nolle prosequi as to the charges in 1999. In 2010, the Defendant was re-indicted for the same incident.  After a trial, the jury returned guilty verdicts of first degree felony murder, second degree murder, and especially aggravated kidnapping. The Defendant raises four issues on appeal: (1) whether the evidence is sufficient to support his conviction for felony murder; (2) whether the trial court erred in denying the Defendant's motion for speedy trial; (3) whether the trial court erred in admitting the testimony of a medical examiner who did not conduct the autopsy of the victim; and (4) whether the trial court erred by allowing the State to recall a witness.  After a review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., joined. THOMAS T. WOODALL, P.J., concurred in part and wrote a separate opinion.

Rob McKinney, Nashville, Tennessee, for the appellant, Thomas Lee Carey, Jr.

Herbert H. Slatery, III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Rob McGuire and Paul Dewitt, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural Background

In March 1998, the Defendant was indicted, along with two other co-defendants, Glenn Daniel Sharber, Jr., and Glenn Daniel Sharber, III, in connection with the 1996 death of Michael Dickerson ("the original indictment"). However, before the State could conduct a transfer hearing in juvenile court for Mr. Sharber, III,[1] the State's key witness, Roland "Pooh-Bear" Patrick,[2] was murdered on the front porch of his home. Consequently, the State entered a nolle prosequi on the charges against the Defendant on July 1, 1999. In 2003, detectives with the cold case unit began investigating the case again.

On February 22, 2010, the Defendant was re-indicted for Mr. Dickerson's murder ("the re-indictment"). The re-indictment included three counts: (Count 1) first degree felony murder; (Count 2) first degree premeditated murder; and (Count 3) especially aggravated kidnapping. Four other co-defendants, Glenn Daniel Sharber, Jr., Glenn Daniel Sharber, III, Frank Blair, IV, and Carlos Lemont Lewis[3] were included in the re-indictment. Eventually, the Defendant was severed from his co-defendants and tried separately.

Before severance, the Defendant and both Sharbers filed a Motion to Dismiss for Denial of Speedy Trial ("Motion for Speedy Trial"). The trial court conducted a hearing on the motion at which Mr. Sharber, Jr., and Mr. Sharber, III presented evidence. The Defendant's attorney did not appear at this hearing, and it is unclear whether the Defendant was present.

*Hearing on Motion to Dismiss for Denial of Speedy Trial*

At the hearing on the Motion for Speedy Trial, Investigator Alfred Gray testified that he reopened the cold case investigation of Michael Dickerson's death in 2003. At the time, the cold case unit was housed in the District Attorney General's office. He actively

---

[1] At the time of the offense, Mr. Sharber, III was a minor.

[2] The record refers to Mr. Patrick as both "Roland Patrick" and "Patrick Roland." At trial, the State informed the court that the correct name was "Roland Patrick," so we will utilize that name in this opinion. Additionally, the record fluctuates between the spelling of Mr. Patrick's first name and nickname–at times spelling them "Rowland" and "Poo-Bear" respectively. For the sake of consistency, we adopt the spelling set out above.

[3] At different points in the record, Mr. Lewis' middle name is spelled "Lamont" and "Lemont." Because his name is spelled "Lemont" on the indictment, we will utilize that spelling in this opinion.

investigated the case until 2007, when the cold case unit was transferred back to the police department. During the years he investigated the case, Investigator Gray did not uncover enough information to re-indict the defendants.

Investigator Gray explained that the case was reopened in 2003 after a federal prisoner, Eric Yokely, approached the U.S. Attorney's office with some information about Mr. Dickerson's death. His statement provided "more information to investigate" about the original three suspects and provided two more names as suspects for the murder, Frank Blair and Carlos Lemont Lewis. In 2004, Investigator Gray traveled to New York City to interview one of the original complainants, Latoya Nicole Buckner. She did not provide sufficient information to initiate formal proceedings against the defendants, but her information was consistent with what she had told police in 1996. Likewise, Investigator Gray interviewed one of the victim's brothers and Frederick Morris, a person accused of having robbed Mr. Sharber, III. Each provided more information about the crime, but Investigator Gray still did not have enough evidence to present to a grand jury. Finally, during his investigation, Investigator Gray interviewed all the individuals eventually listed in the re-indictment, including the Defendant. None of the suspects provided any information to further the investigation. In summation, Investigator Gray explained that cold cases are difficult to solve and may take years of investigation before an indictment can be sought, and he stated that this case was no different from any other cold case.

Detective Norris Tarkington of the Metro Police Department testified that he picked up the cold case investigation in December of 2007. When he received the file from Investigator Gray, there was "[n]ot a whole lot" of new information in the file. Detective Tarkington also explained neither he nor Investigator Gray had the original 1996 investigation file from Detective Clifford Mann. Detective Tarkington interviewed Mr. Sharber, III, who denied any involvement in Mr. Dickerson's murder. Detective Tarkington noted that he tried to interview Mr. Sharber, Jr., but Mr. Sharber, Jr. refused to make a statement. Detective Tarkington also addressed a few phone numbers he had noted in the file, and he opined that those phone numbers were not part of the original file but instead were numbers that he developed from the time he began investigating the case. In short, he explained that his investigation did not uncover any new physical evidence but it did yield new witnesses.

During the State's cross-examination, Detective Tarkington explained that he interviewed 12 or more witnesses and traveled to Pennsylvania and West Tennessee to do so. Most of those witnesses were interviewed between 2008 and 2009. Many of those witnesses were inmates, and their statements needed to be verified. He stated that he did not purposefully delay the investigation to gain a tactical advantage. Additionally, Detective Tarkington noted that both Mr. Sharber, III, and Mr. Lewis were juveniles at the time of the

offenses and the juvenile court had to conduct a transfer hearing before they could be indicted with the other co-defendants. Therefore, Mr. Sharber, III, and Mr. Lewis were arrested in late 2008 and transfer proceedings were initiated. The transfer proceedings caused a delay in the re-indictment, but all five co-defendants were ultimately indicted in 2010.

During this hearing, Mr. Sharber, Jr. and Mr. Sharber, III presented evidence that a number of their alibi witnesses had since passed away. No evidence was presented on the Defendant's behalf.

The record does not contain an order from the trial court's ruling on the Motion to Dismiss for Denial of Speedy Trial. However, during the hearing, the trial court commented:

> I'm going to go ahead and assure you right now in terms of a speedy trial, that's not going to go anywhere; the case was dismissed after 15 months when the key eyewitness apparently for the State was killed, and they had the juvenile proceedings, although it was over a year and therefore it triggers the speedy trial analysis, it was three months over the year and then it was dismissed; let's go to the due process issue after the dismissal of the indictment.

The trial court also noted that, while Mr. Yokely's statement was consistent with the evidence underlying the original indictment, it was "new evidence" in the sense that it gave the police information that they had "lost" when Mr. Patrick died. From there, investigators looked into the case and uncovered new witnesses and new suspects.

The record reflects that the Defendant was severed from his co-defendants on the same day as the hearing on the Motion for Speedy Trial.

*Motion in Limine*

The day before trial, the Defendant filed several motions in limine, including "Defendant, Thomas Carey's, Motion in Limine #2 to Prohibit Introduction and/or Use of Autopsy Report" ("Motion in Limine #2"). The Defendant argued that introduction of the autopsy report would violate his right to confrontation because the doctor who had prepared the report, Dr. Miles Jones, would not be available to testify. After the report was created, Dr. Jones's medical licence was revoked because he over-prescribed medications. Additionally, a Dr. Miles J. Jones was convicted in federal court for failure to file federal tax returns, and the Defendant believed that Dr. Miles J. Jones was the same person who had prepared the autopsy report. The Defendant contended that these facts were significant areas

-4-

for cross-examination and allowing the State to introduce the report through the testimony of another doctor would impede his right to confront Dr. Jones. Additionally, the Defendant argued that another doctor could not testify as to the results of the autopsy because the other doctor did not have personal knowledge of the results but instead would simply "regurgitat[e]" Dr. Jones's report.

The State argued that the victim's cause of death was not the true issue in the case. Instead, the issue was whether the Defendant was involved in the offense. The Defendant countered that the cause of death was a material issue because analysis of the bullet holes could show what caliber of gun fired the "death shot" and that such information may show whether the Defendant fired the shot that killed Mr. Dickerson. However, the State argued that it did not matter who fired the fatal shot because the Defendant would be criminally responsible for the actions of an accomplice. The trial court denied Motion in Limine #2, agreeing with the State that the cause of death was not a material issue in the case. However, the trial court also held that the jury should be informed of Dr. Jones's background.

*Trial*

At trial, Charles Ray Blackwood, a retired officer from the Metro Nashville Police Department, testified that he had worked as a crime scene investigator for about 23 years. On January 6, 1997, Mr. Blackwood assisted in the investigation of a body found near Sulphur Creek Road, a rural area of Nashville. The body was found at a curve in the road where there is a "flat area" next to the roadway and then the terrain drops off steeply. The location of the crime scene "looked like the city dump" because people would frequently dump "trash, household appliances, old junk car[s], [and] tires" off the embankment. The body was discovered about 60 to 70 feet from the top of the hill, and Mr. Blackwood had to use a rope to navigate his way down the steep hill. When it was discovered, the body was severely decomposed and showed signs of animal or insect infestation. The victim's pants were pulled down, and a shirt appeared to be tied around the victim's ankles or lower calf. It appeared as if the body had been in that location for "a while." No guns, knives, or other weapons were found near the body.

Mr. Blackwood also found four small groupings of shell casings in the flat area next to the road at the top of the hill. In total, Mr. Blackwood found nine shell casings, one of which came from a nine millimeter gun. The remaining shell casings could have been fired from an assault rifle or SKS rifle.

The body was taken from the crime scene to the forensic science center. There, Mr. Blackwood took postmortem fingerprints from the victim and used those fingerprints to identify the victim as Michael Dickerson.

On cross-examination, Mr. Blackwood stated that he did not see blood spatter or any blood trails at the crime scene. However, he acknowledged that rain could have washed a blood trail away. He also confirmed that, based on the shell casings he found on the scene, two types of weapons were fired. It was possible that markings on the shell casings could have been matched to the gun that fired it, but Mr. Blackwood did not know if such tests were conducted in this case.

Co-defendant Carlos Lewis testified that he was 16 years old in 1996 and that he was friends with both the Defendant and Mr. Dickerson at the time. He also stated that Mr. Dickerson had three or four older brothers. Mr. Lewis would often "hang out" with Mr. Dickerson after school, and Glenn Daniel Sharber, III, also known as "Little Danny," would frequently "hang out" with them as well. Mr. Lewis, Mr. Dickerson, and the Defendant would occasionally spend the night at Mr. Sharber, III's house. Also, all four friends sold drugs on the streets of their neighborhood.

On December 9, 1996, Mr. Dickerson and Mr. Lewis were in the Haynes Park neighborhood selling drugs. They were standing in a neighbor's driveway when Mr. Sharber, III and the Defendant pulled up in a car. From his vantage point, Mr. Lewis was able to see inside the car and noticed that "the radio had been snatched out, the air conditioner was messed up[,]" and he saw automatic weapons in the car. "[An] AK 47 or SK" was laying "between the seat," and the Defendant was holding what appeared to be a nine millimeter handgun. Mr. Sharber, III was "pissed off" because Mr. Dickerson's brother, Tony Dickerson, and a person named Terry[4] had stolen the radio from Mr. Sharber, III's car. The Defendant and Mr. Sharber, III wanted Mr. Dickerson to take them to his brother to retrieve Mr. Sharber, III's property. Initially, Mr. Dickerson agreed to help them, and he got into the car. The guns were still in plain view when Mr. Dickerson got into the car. Mr. Lewis got into the car with Mr. Dickerson because he "thought [Mr. Dickerson] might need somebody to go with him because [Mr. Dickerson] looked like he was scared." However, as they drove down the street, Mr. Dickerson told Mr. Sharber, III and the Defendant that he did not want to take them to his brother because they were angry and had guns. As a compromise, Mr. Dickerson offered to call his brother to see if he could reason with him. Even though Mr. Dickerson offered to call his brother, Mr. Sharber, III and the Defendant did not pull over to allow him to make a call from a payphone.[5] Instead, they kept driving. Mr. Lewis stated that Mr. Sharber, III appeared to be "real upset" that Mr. Dickerson refused to take them to his brother. The Defendant did not say much during the drive.

---

[4] Terry is identified in the record only by his first name, so we must refer to him by his first name in this opinion. We intend no disrespect.

[5] Mr. Lewis explained that they had pagers, but no one in the car owned a cell phone.

When they reached the "top of the ravine" at Sulphur Creek, Mr. Sharber, III and the Defendant got out of the car. Mr. Lewis also exited the car and tried to grab Mr. Sharber, III to prevent him from hurting Mr. Dickerson. The Defendant ordered Mr. Dickerson out of the car and made him take off his jacket. At this point, Mr. Lewis was trying to reason with Mr. Sharber, III, telling him that Mr. Dickerson "aint't did nothing." The Defendant then said he "wasn't fixin to let [Mr. Dickerson] go because he didn't want his brothers to come back for him." Then, the Defendant shot Mr. Dickerson in the shin, and Mr. Dickerson fell down the hill. After Mr. Dickerson fell, Mr. Sharber, III fired the larger gun into the woods, but because it was so dark, Mr. Sharber, III did not know whether he shot Mr. Dickerson. Afraid, Mr. Lewis jumped back into the car and laid down in the back seat. The Defendant and Mr. Sharber, III then got back into the car and drove toward Haynes Park. Mr. Lewis asked to be dropped off, but the Defendant and Mr. Sharber, III wanted to get the guns out of the car before they did anything else. To that end, they drove to Latonya Wallace's house, where the Defendant's car was parked, and put the guns in the back of the Defendant's car.

A few days after the incident, Mr. Lewis saw the Defendant at a car wash, and they had a conversation about what happened after Mr. Lewis was dropped off. The Defendant told Mr. Lewis that he "had a feeling" Mr. Dickerson was not dead so he and Mr. Sharber, III went back to the scene of the shooting. When they pulled over and turned off the car, they could hear Mr. Dickerson yelling for someone to help him. The Defendant made his way down the hill, pretending to be someone who was trying to help Mr. Dickerson, and when he ascertained where Mr. Dickerson was, he shot him. Mr. Lewis explained that, instead of saying he shot Mr. Dickerson, the Defendant made a motion with his hand to indicate that he was shooting a gun, and Mr. Lewis understood that gesture to mean the Defendant had shot Mr. Dickerson.

In the years following the murder, Mr. Lewis only told one person, his friend Chris Buckner, that he knew something about Mr. Dickerson's death. However, he did not tell Mr. Buckner any details about the incident; he simply told Mr. Buckner that "they shot [Mr. Dickerson] up real bad." Mr. Lewis told anyone who asked that he did not know anything about the incident because he did not want to be involved with the case. He explained that he was afraid for his own life and the safety of his family. The police interviewed him a couple of times, and he told them that he did not know anything. However, in 2009, Mr. Lewis was arrested for Mr. Dickerson's murder. While he was in custody on these charges, Mr. Lewis had telephone conversations with his father in which he told his father that he did not kill Mr. Dickerson. Unbeknownst to Mr. Lewis, these telephone conversations were recorded. The police then approached him and told him that they had listened to his conversations and encouraged him to tell them what he knew. At a meeting in 2010 with Detective Tarkington, the Assistant District Attorney General, and Mr. Lewis' attorney, Mr. Lewis told them what he knew about Mr. Dickerson's death. After that meeting, Mr. Lewis'

bond was reduced, and he has been released on bond ever since. As of the time of the trial, the charges against Mr. Lewis were still pending, and the State had not given Mr. Lewis a promise of immunity or a plea deal in exchange for his testimony.

Before cross-examination of Mr. Lewis, the trial court recessed for lunch. During that recess, Mr. Lewis was exiting the courthouse to smoke a cigarette when the Defendant's cousin approached him and made a comment that Mr. Lewis understood to be a threat. Mr. Lewis immediately reported the threat to courthouse security. In a jury-out hearing, the State asked permission to question Mr. Lewis about this threat after cross-examination to support Mr. Lewis's claim that he was afraid to come forward with information about Mr. Dickerson's murder. The State specifically said that it did not wish to introduce the evidence to show that the Defendant was connected to the threat but to corroborate Mr. Lewis' testimony that he was afraid to come forward. The Defendant argued that there was no evidence that he was connected to the threat so evidence of the threat should not be presented to the jury. The trial court instructed the State to continue its investigation of the threat and report the findings to the trial court the following morning. Meanwhile, Mr. Lewis was instructed not to refer to the threat during cross-examination.

During cross-examination, Mr. Lewis acknowledged that he was not charged in the original indictment. Mr. Lewis admitted that, in 2003 or 2004, he told Detective Gray that he was not involved in Mr. Dickerson's death and he did not know who was involved. Then, when Mr. Lewis was questioned by Detective Gray and Detective Bernard in February 2004, he told them that he did not shoot Mr. Dickerson; he was not present when Mr. Dickerson was shot; and he did not see who shot Mr. Dickerson. In June 2008, Mr. Lewis met Detective Tarkington in a parking lot. Detective Tarkington recorded the conversation, but Mr. Lewis told him that he did not know anything about the murder. During this meeting, Detective Tarkington told Mr. Lewis that the District Attorney could work out a deal with him if he provided information on what he knew about Mr. Dickerson's death, but Mr. Lewis maintained that he did not know anything. Finally, Mr. Lewis was arrested in 2009 for Mr. Dickerson's murder. He spent some time in jail before he told the police and the State what he knew about Mr. Dickerson's death. Mr. Lewis confirmed that his charges had not been reduced in exchange for his testimony and that he could still be tried for murder. However, he stated he was hoping to be rewarded for his testimony.

Mr. Lewis also stated that he and Mr. Dickerson got into the car with the Defendant voluntarily–no one placed a gun to their heads and forced them into the car. No one pointed a gun at them while the car was moving, and they could have gotten out of the car when they wanted.

On redirect, Mr. Lewis stated that he did not know whether his 2010 meeting with Detective Tarkington and the Assistant District Attorney was recorded. However, he said that his statement would have been consistent with the testimony he provided in court regardless of whether he was aware the meeting was recorded. He also stated that the Defendant and Mr. Sharber, III had guns with them in the front seat of the car and, even though Mr. Dickerson got into the car voluntarily, it became clear during the drive that the Defendant and Mr. Sharber, III were not interested in retrieving Mr. Sharber, III's property from Mr. Dickerson's brother. Mr. Lewis stated, "I don't think [Mr. Dickerson] had an idea of this just as well as I didn't that that was what was fixin to happen, you know. If he'd have thought that, he probably wouldn't never got in the car."

Rodney Hilliard testified that he met the Defendant while they were both incarcerated at the Federal Correctional Institution in Memphis. In October 2009, Mr. Hilliard was walking around the track in the yard with the Defendant and an individual named Jeremy Coone. During their walk, the Defendant told them what happened to Mr. Dickerson. The Defendant said he had been selling drugs in Haynes Park when he saw Mr. Dickerson. The Defendant then called "Little Danny" to tell him that he had seen Mr. Dickerson. "Little Danny" then called "Big Danny" and "everybody rounded up, come over to the area, and that's when they snatched him up." The group then beat Mr. Dickerson and questioned him about "the money and drugs and whatever," and they ultimately shot him. The Defendant also told them that he had previously been charged for Mr. Dickerson's murder but he had "beat it" because he had had a witnesses named "Pooh-Bear" killed. The Defendant explained that he had made "some OG calls"[6] to order Pooh-Bear's killing. Mr. Hilliard explained that the Defendant used the term "snatched up" when telling them the story.

Before this conversation, Mr. Hilliard had never heard of Mr. Dickerson or anything about his death. He stated that he did not believe the Defendant's story initially, but he thought that it was strange that someone would brag about committing a murder. However, several months after that conversation, Mr. Hilliard saw an article in The Tennessean about Mr. Dickerson's murder that was consistent with what the Defendant had told him and Mr. Coone. The article did not include details of how the murder was committed or identify anyone by nickname. Mr. Hilliard contacted Detective Tarkington to report what the Defendant had told him. Mr. Hilliard explained that he contacted authorities because "it was the right thing to do" and because he had lost a daughter and he wanted to help bring the Dickerson family some closure. He also acknowledged the possibility that cooperating with authorities could help with his own sentence. However, he noted that he was charged in the federal system, and he understood that the District Attorney General's office had no control

_____

[6] Mr. Hilliard stated that an "OG" was "a person who has some type of rank in a gang organization." The Defendant was a member of the Rolling Sixties Crips.

over his federal sentence. Mr. Hilliard also reported that he was potentially putting himself in danger from other inmates by testifying against the Defendant.

On cross-examination, Mr. Hilliard said that he did not conspire with Mr. Coone to "jump on [the Defendant's] case."[7] The only information that he had about the case came from the Defendant. Mr. Hilliard understood that his sentence could be reduced as a result of his testimony and he was hoping that would happen. However, he stated that a reduced sentence was not the primary reason he chose to testify. On redirect, Mr. Hilliard stated that he would never lie to send someone to prison because he "couldn't live with that."

Tramal Wright testified that he was also incarcerated at the Federal Correctional Institution in Memphis with the Defendant. He was from Little Rock, Arkansas, and before testifying at this trial, had never been to Nashville. In April of 2010, Mr. Wright had a conversation with the Defendant about the Defendant's charges. In that conversation, the Defendant admitted that the State had a hold on him for murder. After that conversation, Mr. Wright and the Defendant began to socialize. Eventually, the Defendant told Mr. Wright that "he and four other individuals tortured and killed a guy by the name of Mike." Mr. Wright recalled that the Defendant said the crime occurred in 1999 or 1996, but Mr. Wright was not sure of the date. The Defendant explained that "Mike" had been killed because he stole drugs that belonged to a "guy named Glen." The Defendant further stated he had beaten the case once before when a key witness was murdered, and he claimed he would beat the present charges. Mr. Wright stated that he did not really believe the Defendant "until [he] checked into it." Mr. Wright reported the conversation to his case manager, and he later wrote a letter to the homicide division of the Nashville police department laying out the information he had about Mr. Dickerson's death. Mr. Wright stated that he would not lie to get out jail because such actions were "[j]ust not [him]" and he "would have no reason to lie."

On cross-examination, Mr. Wright acknowledged that his letter to the police spoke of a murder in Mt. Juliet, Tennessee. He stated that he did not know Mr. Coone or Mr. Hilliard and he never spoke to them about this case. Mr. Wright denied making up his testimony. On redirect examination, Mr. Wright clarified that his letter stated that the body was dumped in a ditch near Mt. Juliet. He further confirmed that he had never been to Nashville and he did not know where Mt. Juliet was. Before 2010, he had never heard of Mt. Juliet.

---

[7] Earlier is his testimony, Mr. Hilliard explained that a person "jump[s] on somebody's case" when they cooperate with the authorities.

Eddie Dixon testified that he met the Defendant when they were both incarcerated in a federal facility in Bowling Green, Kentucky in 2011. A couple of weeks after the Defendant arrived at the facility, Mr. Dixon heard the Defendant say, "He killed a n– back in the day" and that "he had a cold case coming up for trial." Mr. Dixon heard the Defendant make this statement four or five times. The Defendant did not provide any details about the crime. Mr. Dixon told the U.S. Attorney's office about the Defendant's statement approximately one week before the Defendant's trial began. He said that he understood the District Attorney's office in Nashville could not influence his federal sentence.

Retired Detective James Douglas Sledge testified that he was working with the homicide unit of the Metropolitan Nashville Police Department in 1999. On June 8, 1999, Mr. Sledge responded to a crime scene on Combs Drive. There, he saw the body of Roland "Pooh-Bear" Patrick. Mr. Patrick was laying across the front steps of his house, and there were visible gunshot wounds to his body. Mr. Sledge knew that Mr. Patrick was a potential witness in connection with Mr. Dickerson's death.

Before the State's medical examiner, Dr. Amy McMaster, testified, the State announced that the doctor who had performed Mr. Dickerson's autopsy had subsequently had his medical licence revoked for reasons independent of his work as a pathologist.

Dr. McMaster testified that she was the Chief Medical Examiner for Davidson County. At the State's request, she had reviewed the January 1997 autopsy report for Michael Dickerson that was completed by a Dr. Jones. She explained the general procedure for conducting an autopsy in their office. She noted that it appeared that a substantially similar procedure was followed for Mr. Dickerson's autopsy in 1997, but the reports looked very different from the reports used today. Dr. McMaster stated that she had reviewed the autopsy report, autopsy photographs, and crime scene photographs in preparation for her testimony. Based on her review, the body was in an advanced stage of decomposition when the autopsy was performed, and she noted that decomposition made it more difficult to catalog injuries and determine cause of death. However, based on what was described in the autopsy report and her review of the photographs, Dr. McMaster concluded that Mr. Dickerson's body had wounds consistent with gunshot wounds. She also noted that Dr. Jones's report indicates that he recovered bullet fragments. Based on her review of the autopsy report and photographs, Dr. McMaster concluded that Mr. Dickerson's death was a homicide.

On cross-examination, Dr. McMaster admitted that she relied on Dr. Jones's "professionalism" in his report. However, she noted that she did not base her opinion on Dr. Jones's reputation but instead based her opinion on what she saw in the autopsy report and photographs. She also admitted that she did not know what caliber bullet was recovered

-11-

from the autopsy and that she did not know whether the bullet fragments were subjected to any further testing.

Detective Tarkington testified that he examined the bullet fragments recovered from Mr. Dickerson's autopsy during his cold case investigation. He stated that he was unable to match the bullet fragments to a weapon because no weapons were recovered in connection with this case.

Before the final day of trial began, the trial court considered whether Mr. Lewis should be allowed to testify about the lunch-time threat from the previous day. Defense counsel vigorously argued that such testimony would be inadmissible hearsay. The State argued that the testimony would not be offered for the truth of the matter asserted but instead was offered to corroborate Mr. Lewis's testimony about why he was afraid to come forward with information about the crime. The trial court ruled that Mr. Lewis would be allowed to testify about the lunch-time threat but was not allowed to say that the threat came from the Defendant's cousin.

The State re-called Mr. Lewis as its final witness. Mr. Lewis told to the jury that a man he knew as "Moochie" approached him during the lunch recess the day before and said, "You're a b– a– n– for what you doing, I'm going to take care of you for that." Mr. Lewis responded, "Man, you know, I ain't going nowhere, I gotta do what I gotta do," and he told courthouse security that he had been threatened. He testified that the threat made him very afraid. After Mr. Lewis's testimony, the trial court instructed the jury that Mr. Lewis's testimony about the threat could only be used to judge the credibility of the rest of his testimony and it could not be considered as evidence that the Defendant knew of or condoned the threat.

The jury convicted the Defendant of first degree felony murder in Count 1, second degree murder in Count 2, and especially aggravated kidnapping in Count 3. The trial court merged Count 2 into Count 1. Pursuant to an agreement between the Defendant and the State, the trial court imposed concurrent sentences of life in Count 1 and 15 years in Count 3. The Defendant's motion for new trial was denied. This timely appeal followed.

## II. Analysis

*Sufficiency of the Evidence*

The Defendant contends that the evidence was insufficient to support his first degree felony murder conviction because the record does not support the underlying offense of especially aggravated kidnapping. The Defendant argues that the State must prove the

predicate felony before the Defendant could be convicted of felony murder, and he claims that Mr. Dickerson and Mr. Lewis were not kidnapped but got into the car voluntarily. Additionally, the Defendant claims that especially aggravated kidnapping is not a predicate felony which triggers the felony murder rule. The State argues that there is sufficient evidence to support the conviction because the Defendant and Mr. Sharber, III were armed, "snatched" Mr. Dickerson from Haynes Park, drove him to a remote location, and shot him. Second, the State notes that the predicate felony listed in the indictment was kidnapping, not especially aggravated kidnapping.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight and value to be given the evidence are resolved by the fact finder. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded on other grounds by Tenn. R. Crim. P. 33 as stated in State v. Moats, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This Court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

As a preliminary matter, we agree with the State that the predicate offense for first degree felony murder in this case is kidnapping and not especially aggravated kidnapping. See Tenn. Code Ann. § 39-13-202(a)(2) (1991 & Supp. 1996). Therefore, we review the evidence to determine whether the evidence was sufficient to support a conviction for kidnapping.

As charged in Count 1 of the re-indictment, first degree felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping . . . ." Id. Kidnapping is "[f]alse imprisonment as defined in § 39-13-302: (1) under circumstances exposing the other person to substantial risk of bodily injury[.]" Tenn. Code Ann. § 39-13-303(a)(1) (1991). Under section 39-13-302, "[a] person commits the

offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (1991). Because it serves a building block for Tennessee's kidnapping statutes, false imprisonment is meant to "broadly address[] any situation where there is an interference with another's liberty." Id., Sentencing Comm'n Cmts.; State v. White, 362 S.W.3d 559, 574-75 (Tenn. 2012).

When viewed in a light most favorable to the State, the evidence shows that the Defendant and Mr. Sharber, III kidnapped Mr. Dickerson from Haynes Park. Both the Defendant and Mr. Sharber, III had guns in the car with them. They asked Mr. Dickerson to get into the car and take them to Mr. Dickerson's brother. Mr. Dickerson looked afraid but got into the car. While the car was moving, Mr. Dickerson told the Defendant and Mr. Sharber, III that he did not want to take them to his brother, but he offered to call his brother to try to get Mr. Sharber, III's property back. However, the Defendant and Mr. Sharber, III did not stop the car to allow the Defendant to make the phone call; instead, they continued to a remote area. When they stopped the car, the Defendant ordered Mr. Dickerson out of the car and said that could not let Mr. Dickerson go because he did not want Mr. Dickerson's brothers to come back for him. Thereafter, he shot Mr. Dickerson in the leg, causing him to fall down the hill. Later, in order to ensure that Mr. Dickerson was dead, the Defendant returned to the scene, found Mr. Dickerson on the hill, and shot him again. Based on the evidence presented, there is sufficient evidence to support kidnapping as the predicate felony for the Defendant's felony murder conviction in Count 1.

*Denial of Defendant's Motion for Speedy Trial*

The Defendant argues that the trial court erred in denying his Motion for Speedy Trial. In support of this claim, the Defendant contends that the 14-year delay between the offense and the re-indictment infringed upon his Sixth Amendment right to a speedy trial and caused "severe and monumental prejudice." The State first argues that the issue is waived because the Defendant failed to include in the record the trial court's order on his Motion for Speedy Trial. In the alternative, the State contends that the speedy trial analysis is not applicable to the Defendant's claim. Instead the Defendant's argument implicates Fifth Amendment due process principles that protect a defendant from unreasonable delay between the commission of a crime and the commencement of adversarial proceedings. Under a Fifth Amendment due process analysis, the State contends that the Defendant failed to demonstrate that his defense was prejudiced by the delay or that the State caused the delay in order to gain a tactical advantage.

We agree with the State that the issue is waived. The Defendant bears the burden of preparing a record which conveys "a fair, accurate, and complete account of what transpired

with respect to those issues that are the bases of the appeal." Tenn. R. App. P. 24(b). The record on appeal does not contain the trial court's ruling on the Defendant's Motion for Speedy Trial.

Waiver notwithstanding, we will address the merits of the Defendant's claim. At the outset, we note that the Defendant presents his argument in the context of the right to a speedy trial, but he bases his argument on the 14-year delay between the commission of the offense and the re-indictment. The Sixth Amendment right to a speedy trial is not triggered until the time of arrest or indictment. United States v. Marion, 404 U.S. 307, 320 (1971); State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997). In Tennessee, it is well-settled law that "delay between the commission of an offense and the commencement of adversarial proceedings does not violate an accused's constitutional right to a speedy trial" but instead implicates the Defendant's Fifth Amendment due process rights. State v. Gray, 917 S.W.2d 668, 671 (Tenn. 1996) (quoting State v. Dykes, 803 S.W.2d 250, 255 (Tenn. Crim. App. 1990) overruled on other grounds as stated in State v. Hooper, 29 S.W.3d 1, 8 (Tenn. 2000)) (internal quotation marks omitted). Moreover, the speedy trial right "does not apply during time periods when charges have been dismissed." State v. Vickers, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997) (citing United States v. McDonald, 456 U.S. 1, 8 (1982)).

Therefore, in this case the Sixth Amendment right to a speedy trial does not apply to the 14-year delay between the commission of the offense and the re-indictment. Instead, the Defendant's argument presents a Fifth Amendment due process challenge. See Gray, 917 S.W.2d at 671. The fact that the Defendant had previously been indicted for the same offense does not affect our conclusion; the original indictment was nolle prosequied, and the speedy trial right does not apply to the period of time between the dismissal and re-indictment. See Vickers, 985 S.W.2d at 5. However, we will address the Defendant's claim on both due process and speedy trial grounds.

### a. Due Process

The Due Process Clause of the Fifth Amendment requires dismissal of an indictment "if it were shown at trial that the pre-indictment delay . . . caused substantial prejudice to the [defendant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." Marion, 404 U.S. at 324. In Tennessee,

> [b]efore an accused is entitled to relief based upon delay between the offense and the initiation of adversarial proceedings, the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain a tactical advantage over or to harass the accused.

-15-

Dykes, 803 S.W.2d at 256. However, in cases where the State is unaware that a crime has been committed, "the trial court must consider only the length of the delay, the reason for the delay, and the degree of prejudice to the accused." Utley, 956 S.W.2d at 495.

In this case, the State learned that a crime had been committed within a month of Mr. Dickerson's death. Therefore, the traditional Marion-Dykes analysis applies. The 14-year delay between the offense and the re-indictment is sufficient to trigger a due process inquiry. See, e.g., State v. Carico, 968 S.W.2d 280 (Tenn. 1998) (conducting a due process inquiry for a seven-year delay between offense and arrest); Utley, 956 S.W.2d 489 (five-year delay). However, the Defendant cannot satisfy the other two factors required for relief. First, although a hearing was conducted on the Defendant's Motion for Speedy Trial, the Defendant presented no evidence to show how he was prejudiced by the delay. Likewise, in his brief on appeal the Defendant claims that the delay "severely prejudiced his case due to the difficultly in locating key witnesses, the faded memories of the events surrounding the incident, and the pretrial incarceration of approximately [12] months while awaiting trial on the initial indictment." Despite this claim, the Defendant does not identify any witnesses he was unable to locate or explain how the faded memories and 12-month incarceration for the original indictment *actually* prejudiced his defense. Second, the Defendant does not provide any proof that the State "caused the delay in order to gain a tactical advantage or to harass the [Defendant]." See Gray, 917 S.W.2d at 671. Moreover, the evidence presented at the hearing on the Motion for Speedy Trial and the trial court's comments about that evidence show that the delay was caused by the challenging nature of cold case investigations, not by the State's intent to gain a tactical advantage over the Defendant. Therefore, the Defendant is not entitled to relief on Fifth Amendment due process grounds.

### b. Speedy Trial

We turn next to the Defendant's claim that his right to a speedy trial was violated. Once criminal proceedings have been initiated, the right to a speedy trial is implicated under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. Tennessee also has a statutory right to a speedy trial. See Tenn. Code Ann. § 40-14-101 (2008). In Barker v. Wingo, 407 U.S. 514 (1972), the United States Supreme Court laid out the four factors reviewing courts must balance when determining whether a defendant's right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to speedy trial; and (4) prejudice to the defendant. Id. at 530. The Tennessee Supreme Court implicitly adopted the Barker balancing test for our state's constitutional and statutory right to a speedy trial. State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1973). A delay approaching one year will trigger the speedy trial analysis, and the presumption that delay has prejudiced the defendant intensifies over time. Doggett v. United States, 505 U.S. 647, 652 (1992); Utley, 956 S.W.2d

at 494. However, courts take into account the complexity of the case in evaluating the reasonableness of the length of the delay. State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996).

In the present case, the Defendant was indicted on February 22, 2010, and he was tried on April 16-18, 2012. The two- year delay is sufficient to trigger a speedy trial analysis. Additionally, the record reflects that the Defendant asserted his right to a speedy trial by filing his Motion for Speedy Trial.[8] However, the record reflects that this was a complex murder case involving multiple defendants. The case was vigorously defended in pretrial motions practice, including a motion for severance, a motion and hearing to dismiss for denial of speedy trial, and several motions in limine. Additionally, the Defendant has not articulated how he was prejudiced by the delay between the indictment and the trial, and we do not believe the two-year delay between indictment and trial is sufficient to presume prejudice in this case. Therefore, we conclude that the Defendant was not denied his right to a speedy trial.

*Admission of Autopsy Report and Dr. McMaster's Testimony*

The Defendant argues that the trial court erred in allowing Dr. McMaster to testify "solely from the report by Dr. Jones." The Defendant claims that, by allowing Dr. McMaster to testify about Dr. Jones's autopsy report, the Defendant was unable to test the credibility of the medical examiner who performed the autopsy. The State argues that the autopsy report is generally non-testimonial in nature and may be admitted into evidence without violating the Defendant's right to confrontation. Additionally, the State contends that, as an expert in the field of pathology, the trial court properly allowed Dr. McMaster to testify as to her conclusions about Mr. Dickerson's cause of death based on her review of "the facts and data provided in Dr. Jones's autopsy report." We agree with the State.

a. Admission of Autopsy Report Not Performed by Witness

In a criminal trial, the defendant has a right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Similarly, the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. I, § 9. Our Supreme Court has described the Tennessee Constitution as imposing "a higher right than that found in the federal constitution." State v. Deuter, 839

---

[8] The Motion for Speedy Trial was based on the 14-year delay between the offense and the indictment. As noted earlier in this opinion, and as argued by the State in its response to the Motion, the Defendant's Motion was in fact based on due process grounds instead of speedy trial grounds. However, for the sake of this analysis, we will accept the Motion for Speedy Trial as the Defendant's assertion of his right to a speedy trial.

S.W.2d 391, 395 (Tenn. 1992). However, "when deciding claims based on the right to confrontation provided in article I, section 9, we have expressly adopted and applied the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment." State v. Jessie Dotson, — S.W.3d —, No. W2011-00815-SC-DDT-DD, 2014 WL 4825169, at *50 (Tenn. Sept. 30, 2014) (citing State v. Parker, 350 S.W.3d 883, 898 (Tenn. 2011); State v. Franklin, 308 S.W.3d 799, 809-10 (Tenn. 2010); State v. Cannon, 254 S.W.3d 287, 301 (Tenn. 2008); State v. Lewis, 235 S.W.3d 136, 145 (Tenn. 2007)).

In Crawford v. Washington, 541 U.S. 36 (2004), the United States Supreme Court held that the Confrontation Clause allowed admission of "[t]estimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. at 59. Nontestimonial statements, on the other hand, are exempt from the Confrontation Clause analysis. Id. at 68. To distinguish between testimonial and nontestimonial statements, the Court adopted what has become known as "the primary purpose test," concluding:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis v. Washington, 547 U.S. 813, 822 (2006). The primary purpose of an interrogation is determined by an objective evaluation of "the circumstances in which the encounter occurs and the statements and actions of the parties." Michigan v. Bryant, 562 U.S. 344, ____, 131 S.Ct. 1143, 1156 (2011).

In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), the Court concluded that "affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine" were testimonial and subject to exclusion under the Confrontation Clause analysis. Id. at 307, 311. Based on the facts of the case, the Court concluded that "the affidavits [were] made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 311 (citations and internal quotation marks omitted). Moreover, "under Massachusetts law the *sole purpose* of the affidavits was to provide 'prima facie evidence of the composition, qualify, and the net weight' of the analyzed substance." Id. (quoting Mass. Gen. Laws, ch. 111, § 13) (emphasis in original). "Absent a showing that the analysts were unavailable to testify at trial *and* that [the defendant] had a prior opportunity to cross-

examine them, [the defendant] was entitled to be confronted with the analysts at trial." Id. (citations and internal quotation marks omitted) (emphasis in original).

Two years later, in Bullcoming v. New Mexico, – U.S. –, 131 S.Ct. 2705 (2011), the Court held that the defendant's confrontation rights were violated when the prosecutor introduced results of forensic testing of the defendant's blood alcohol concentration through the testimony of a forensic analyst who was familiar with the laboratory's testing procedure but who did not participate in or observe the test on the defendant's blood sample. 131 S.Ct. at 2709. The Court reiterated the rule that a testimonial statement may not be introduced at trial unless the witness who made the statement is unavailable and the defendant had a prior opportunity to confront the witness. Id. at 2713. The Court rejected the argument that the "comparative reliability of an analyst's testimonial report drawn from machine-produced data" allowed a surrogate witness's testimony to satisfy the constitutional confrontation requirement. Id. at 2715. The Court explained, "[The Confrontation Clause] does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." Id. at 2716.

Based upon Melendez-Diaz and Bullcoming, this Court held that an autopsy report is testimonial in nature and that the admission of its contents, absent the opportunity to cross-examine the pathologist who conducted the autopsy, violated the defendant's right to confrontation. State v. James Drew Freeman, Jr., No. M2011-00184-CCA-R3-CD, 2012 WL 1656975, at *10-13 (Tenn. Crim. App. May 9, 2012), perm. app. denied, (Tenn. Oct. 17, 2012).

However, less than two months after James Drew Freeman, Jr. was released, the United States Supreme Court released its opinion in Williams v. Illinois, — U.S. —, 132 S.Ct. 2221 (2012). Williams involved a bench trial in a rape case during which a forensic specialist from an Illinois state laboratory testified that she matched a DNA profile produced by an outside laboratory from a vaginal swab taken from the victim to a DNA profile that the state laboratory obtained using a sample of the defendant's blood. In a plurality opinion, the Court concluded that the testimony did not violate the Confrontation Clause. 132 S.Ct. at 2240. The Court also noted that the outside laboratory's report had not been introduced into evidence, but the Court concluded that there would have been no Confrontation Clause violation even if the report had been entered for its truth. Id. at 2242.

The Court explained that statements which violate the Confrontation Clause share two characteristics: "(a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." Id.

at 2242. Additionally, while the Court noted that the reports in <u>Melendez-Diaz</u> and <u>Bullcoming</u> qualified as testimonial statements, those cases "did not hold that all forensic reports fall into the same category." <u>Id.</u> at 2243. Instead, those reports violated the Confrontation Clause,

> because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial. There was nothing resembling an ongoing emergency, as the suspects in both cases had already been captured, and the tests in question were relatively simple and can generally be performed by a single analyst.

<u>Id.</u> The Court also noted that the technicians who prepared the reports in <u>Melendez-Diaz</u> and <u>Bullcoming</u> must have realized that the reports' contents would be incriminating. <u>Id.</u> When applying an objective test to determine the primary purpose of an out-of-court statement, the Court explained, "We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances." <u>Id.</u> (citations omitted). In light of that standard, the Court concluded that the primary purpose of the independent laboratory's DNA report in <u>Williams</u> "was not to accuse the defendant or to create evidence for use at trial," but instead was to "catch a dangerous rapist who was still at large." <u>Id.</u> In his concurring opinion, Justice Breyer recognized that "[a]utopsies, like the DNA report in this case, are often conducted when it not yet clear whether there is a particular suspect or whether the facts surrounding the autopsy will ultimately prove relevant in a criminal trial." <u>Id.</u> at 2251 (Breyer, J. concurring).

Since <u>Williams</u>' release, this Court has twice reviewed claims very similar to the Defendant's and determined that it was not error for the trial court to admit an autopsy report written by a different medical examiner than the one testifying. See <u>State v. Thomas Lee Hutchison</u>, No. E2012-02671-CCA-R3-CD, 2014 WL 1423240, at *30 (Tenn. Crim. App. April 11, 2014) <u>perm. app. granted</u>, (Tenn. Oct. 20, 2014); <u>State v. Jessie Dotson</u>, No. W2011-00815-CCA-R3-DD, 2013 WL 4728679, at *66 (Tenn. Crim. App. June 25, 2013).[9]

---

[9] The Tennessee Supreme Court subsequently reviewed the confrontation issue in an appeal from our decision in <u>Jessie Dotson</u>. <u>Jessie Dotson</u>, — S.W.3d —, 2014 WL 4825169, at *50-60. The Court noted that the fractured decision in <u>Williams</u> provided "little guidance and [was] of uncertain predecedential value because no rationale for the decision–not one of the three proffered tests for determining whether an extrajudicial statement is testimonial–garnered the support of a majority of the Court." <u>Id.</u> at 56. However, the Court concluded that it "need not decide in this case whether autopsy reports are testimonial or whether a medical examiner may testify about an autopsy report produced by another pathologist who does not testify at trial." <u>Id.</u> at 60. Instead, the Court held that "no clear rule of law was breached" by the admission of the autopsy reports or the surrogate witness's testimony about them, and the defendant was not entitled to relief under the plain error doctrine. <u>Id.</u> Additionally, we note that the Tennessee Supreme Court recently granted

As this Court noted in Jessie Dotson, the Williams decision "effectively abrogated this court's holding in *James Drew Freeman, Jr.* that the admission of an autopsy report prepared by a pathologist who does not testify at trial violates the Confrontation Clause." Jessie Dotson, 2013 WL 4728679, at *66. Additionally, in Thomas Lee Hutchison, this Court held that an autopsy report was nontestimonial even when the autopsy was performed when the defendant was already in custody. 2014 WL 1423240, at *30. In that case, we concluded that the primary purpose "was to identify the injuries sustained by the victim and determine his cause of death. It was not 'accusing a targeted individual of engaging in criminal conduct.'" Id. (quoting Williams, 132 S.Ct. at 2242).

In the present appeal, the Defendant contends that this case is distinguishable from Williams because the medical examiner who performed the autopsy subsequently had his medical licence revoked and was "indicted and served a sentence in federal court."[10] However, those facts would not affect the testimonial/nontestimonial nature of the autopsy report. Under the primary purpose test, the autopsy report is nontestimonial. Much like the autopsy report in Thomas Lee Hutchison, Dr. Jones's autopsy report was prepared to determine the cause of Mr. Dickerson's death, and it was not "accusing a targeted individual of engaging in criminal conduct." See Thomas Lee Hutchison, 2014 WL 1423240, at *30; see also Williams, 132 S.Ct. at 2242. While Dr. Jones's subsequent history was relevant to the weight and credibility to be given to his report, its admission at trial through Dr. McMaster was not a violation of the Confrontation Clause.

### b. Dr. McMaster's Testimony

Further, the trial court properly allowed Dr. McMaster to testify regarding the autopsy report. As a medical examiner, the testimony was well within Dr. McMaster's field of expertise, and the autopsy report prepared by Dr. Jones was "of a type reasonably relied upon by experts." See Tenn. R. Evid. 703; James Drew Freeman, Jr., 2012 WL 1656975, at *14. Additionally, this Court has previously held that "the Confrontation Clause does not limit

---

the defendant's Rule 11 application in Thomas Lee Hutchison and will address the particular issue of "whether the Court of Criminal Appeals erred by upholding the trial court's admission of an autopsy report prepared by [one medical examiner] during the testimony of [another medical examiner.]" State v. Thomas Lee Hutchison, No. E2012-02671-SC-R11-CD, 2014 Tenn. LEXIS 879, at *1 (Tenn. Oct. 20, 2014).

[10] Although the Defendant asserts that the Dr. Miles J. Jones who was convicted in federal court for failure to file federal tax returns was the same Dr. Jones who performed the autopsy in this case, there is no evidence establishing that they are the same person. Moreover, we note that the trial court ensured the jury was able to weigh the credibility of Dr. Jones's report by allowing the parties to announce before Dr. McMaster's testimony that, subsequent to performing Mr. Dickerson's autopsy, Dr. Jones's medical license was revoked for reasons unrelated to his work as a pathologist.

experts offering their own opinion regardless of the independent admissibility of the material relied upon." James Drew Freeman, Jr., 2012 WL 1656975, at *14 (citations omitted). Dr. McMaster testified as to her own conclusions after reviewing Dr. Jones's report, the autopsy photos, and the crime scene photos; she did not simply recite the conclusion of Dr. Jones's report. Moreover, the Defendant had the opportunity to cross-examine Dr. McMaster regarding her conclusions of the victim's cause of death, and he was able to identify limitations placed up Dr. McMaster's testimony due to the fact that she did not participate in the autopsy. Therefore, the Defendant is not entitled to relief on this issue.

*Re-calling Mr. Lewis to Testify About the Threat*

The Defendant argues that the trial court erred by allowing the State to recall Mr. Lewis to testify about the person who threatened him after his direct testimony "despite there being no proof that [the Defendant] took any affirmative action to convey the threat or direct that threat to be conveyed." The Defendant contends that any probative value of Mr. Lewis' testimony about the threat was outweighed by its prejudice because the State's case "hinged" on Mr. Lewis' credibility. The Defendant claims "[a]ny shred of evidence to show that [Mr. Lewis] was more truthful than not" prejudiced his case. The State notes that the Defendant "strenuously challenged" Mr. Lewis' credibility during cross-examination. Therefore, the State argues that the trial court properly allowed Mr. Lewis to testify about the threat to "establish that the delay in reporting was due to Mr. Lewis's fear for his safety." We agree with the State.

The admission of evidence is largely discretionary, and this Court will not disturb a trial court's decision as to the admissibility of evidence absent an abuse of that discretion. State v. Harris, 30 S.W.3d 345, 350 (Tenn. Crim. App. 1999) (quoting State v. Gray, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997)). Generally, all relevant evidence is admissible, and evidence that is not relevant is inadmissible. Tenn. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

In this case, Mr. Lewis testified on direct examination that he waited years to come forward with his knowledge of the offense because he was afraid for his own life and the safety of his family. On cross-examination, defense counsel asked Mr. Lewis about four individual instances where Mr. Lewis told the police that he did not know anything about Mr. Dickerson's death. Such cross-examination established that Mr. Lewis had remained silent

about Mr. Dickerson's death for five to six years, and he only decided to come forward after he was arrested on charges related to Mr. Dickerson's death. Mr. Lewis also admitted on cross-examination that he was still facing those charges, and he stated that he hoped he would be rewarded for his testimony against the Defendant. Consequently, defense counsel was able to seriously question Mr. Lewis' credibility. Mr. Lewis was threatened in the courthouse immediately after his direct examination. Such evidence was highly probative of the validity of his claim that he was afraid he would place himself in danger if he reported what he knew about Mr. Dickerson's death. The trial court instructed the jury that the threat could only be considered to weigh the credibility of Mr. Lewis' testimony and that the threat could not be considered as evidence that the Defendant knew of or condoned the threat. As such, we do not believe the  prejudicial effect on the Defendant's case "substantially outweighed" the probative value of Mr. Lewis' testimony regarding the threat. The trial court did not abuse its discretion by permitting the State to re-call Mr. Lewis. The Defendant is not entitled to relief on this issue.

### III.  Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.


_____
ROBERT L. HOLLOWAY, JR., JUDGE